In the Matter of the Estate of MAX H. KERSHOW,
Deceased.

[No. 25,326; decided January 18, 1902.]

Will Contest.—The Burden of Proof in a Will Contest is on the contestant, and he should establish by a preponderance of evidence the issues which he tenders.

Will Contest.—The Judgment of a Court of Another State admitting to probate as the last will of a decedent a document earlier in date than the one in contest is admissible in evidence under the general issue raised by an allegation that the document propounded as the last will of the decedent is not his will and a denial of this allegation.

Probate of Will—Extraterritorial Force of Decree.—A probate proceeding is a proceeding in rem, and a decree admitting a will to probate is confined in its operation to things within the state setting up the court.

Probate of Will—Foreign Decree.—"Full Faith and Credit" is given to a probate decree abroad, when the same faith and credit is given to it which it has at home, which is, that it is conclusive evidence of the validity of the will as affecting title to things within the jurisdictional limits of the court at the death of the testator, whether such title comes in contest within or without those limits; but de jure no evidence whatever of title to things not then within those limits.

Foreign Decrees.—The Constitutional Provision that Full Faith and Credit shall be given in each state to the judicial proceedings of every other state is not designed to extend the jurisdiction of local courts or to extend beyond its limits the operation of a local decree, but to provide a mode of authenticating evidence of the record of a judicial proceeding had in one state, so that a proper general result of it may conveniently be attained in every other state against persons and things justly within the range of the proceeding.

Probate of Will—When not Barred by Prior Foreign Probate.— Where a testator's domicile at the time of his death was in this state, and he left personal estate therein, a decree of a court of another state, rendered upon constructive notice, admitting to probate a prior will, is no bar to the jurisdiction of a court of this state to admit to probate a subsequent will presented to it for that purpose.

Wills.—A Person is of Sound and Disposing Mind who is in full possession of his mental faculties, free from delusion and capable of rationally thinking, acting and determining for himself.

**Insanity.—A Lucid Interval is a Period of Mental Clearness** enjoyed by an insane person; it is an interval during which the patient is restored so far as to be able beyond doubt to understand and to do the act with such reason, memory and judgment as to make it legal.

**Insanity.—A Statement that a Person may have had Reasoning Power** and yet have been unsound in mind imports a contradiction in terms, as does the statement that a person had strong will power and yet was unsound in mind.

**Wills.—Where a Person Who has Indulged in Intoxicants** to such an extent as to debilitate his mind suspends his drinking for a period, and by such suspension so far regains possession of his faculties as to admit of the presumption that his will was made during the time of his calm and clear intermission, the testament is held good.

**Wills—Insane Delusion.—Unless a Will is the Very Creature** of a morbid delusion put into act and energy, it is a valid will. The mere fact of the possession of a delusion may not be sufficient to render a person incapable of making a valid will; a person of sufficient mental capacity, though under a delusion, may make a will; if the testament is in no way the offspring of such a delusion, it is unaffected by it.

**Wills—Moral Quality of Testament.—A court** has neither right nor power to quarrel with the moral quality of a testator's acts; it may not say that he should have made a different disposition; it cannot make a will for him.

**Wills.—The Constituents of Testamentary Capacity** are that the testator has an idea of the character and extent of his property, and is capable of considering the persons to whom and the manner and proportions in which he wishes his property to go.

**Will Contest.—Upon a Review of the Evidence,** it was held in this case that the document offered for probate was executed by the decedent as and for his last will; that it was executed and attested in accordance with the law of this state, and that the testator was, at the time of such execution, of sound mind and competent in every respect to dispose of his estate by will.

Max H. Kershow died in San Francisco, state of California, on June 26, 1901. On September 6, 1901, Hall McAllister and Rhea Gettings presented to the court a document bearing date the sixth day of April, 1901, and purporting to be the last will and testament of the decedent, together with a petition for the probate thereof and for the appointment of petitioners as executor and executrix thereof respectively.

On September 23, 1901, Hall McAllister filed a renunciation of his right to act as executor, and on September 27,

1901, Rhea Gettings, by leave of the court filed an amended and supplemental petition for the probate of said document and for her appointment as executrix thereof.

On October 10, 1901, Carlton M. Kershow, a brother of decedent, filed written grounds of opposition to the probate of the alleged will.

As grounds of opposition, contestant alleged that the decedent at the time of his death was a resident of Philadelphia, Pennsylvania, and not a resident of San Francisco, California, and that he did not leave any estate whatsoever within the state of California; that the document offered for probate is not the last will and testament of decedent, and that he did not at any time affix his signature thereto as and for his last will and testament or for any testamentary purpose whatsoever; that said document was not signed by the decedent in the presence of J. Morgan Smith and A. J. Meadows, whose names are subscribed thereto as witnesses, nor in the presence of either of them, and that decedent at no time declared or published or acknowledged said document to said witnesses, or either of them, as his last will and testament, or as any will or testament whatsoever, and that neither Smith nor Meadows was, at any time, requested by decedent to subscribe his name to said document as a witness thereto, and that neither of them did subscribe his name to said document as a witness or otherwise in the presence of decedent or in the presence of the other; that at the date when the signature of decedent was affixed to said document, he was not, and for a long time prior thereto had not been, of sound and disposing mind, but, on the contrary, that he was at said time, and for a long time prior thereto had been, by reason of disease and disability, of unsound mind and incompetent to dispose by will of his estate.

On October 14, 1901, the proponent filed her answer to the written grounds of opposition, denying specifically each of the matters set up as a ground of contest. Both parties waived a trial by jury, and on November 18, 1901, the trial of the contest was commenced before the court sitting without a jury.

M. F. Michael, William Rix and Bishop, Wheeler & Hoefler, for contestant.

H. I. Kowalsky, Edmund Tauszky and Deal, Tauszky & Wells, for proponent.

COFFEY, J. The burden of proof being imposed upon the contestant, he should establish by a preponderance of evidence the issues tendered by him.

1. As to jurisdiction, this is found against the contestant, it appearing that decedent, Max Howard Kershow, was, according to his own sworn statement, a resident of the city and county of San Francisco on the nineteenth day of July, 1900, when he was registered as a qualified elector by the registrar and that he had not subsequently changed his residence. At the time of his death in this city and county he left estate herein consisting of money in bank and personal effects. These facts clothed the court with original jurisdiction; but it is claimed by contestant that this court is devested of authority in the premises because of a judgment rendered in the orphans' court of Philadelphia, Pennsylvania, July 10, 1901, admitting to probate a will of a date prior to the paper here propounded, the record of which proceeding is properly before this tribunal under the general issue, it not being necessary to plead it specially. As it might come in as evidence legitimately, and in that manner operate as a bar to this application, it must be considered in that connection, and it is for this court to appraise its legal value herein.

Summarized, the contention of contestant is that the judgment of the orphans' court of Philadelphia, Pennsylvania, admitting the will of decedent to probate in July, 1901, is binding upon this court, as a judgment in rem concluding all the world. To support this contention contestant relies upon certain citations in the notes to Bowen v. Johnson, 73 Am. Dec. 53. I have read attentively these notes and the principal case, and I think the context fairly states the rule when it says that the probate of a will is unlike a judgment between parties subject to the jurisdiction of the court ren-

dering it, in this: that being but a decree in rem, usually passed upon constructive notice only, it is confined in its operation to things within the state setting up the court which takes the probate.    It has been so treated in the country from which we derive our jurisprudence, and in general, at least, by the courts and legislatures of our own.    ''Full faith and credit'' is given to it abroad, when the same faith and credit is given to it which it has at home; and that is that it is to be conclusive evidence of the validity of the will, as affording title to things within the jurisdictional limits of the court at the death of the testator, whether such title comes in contest within or without those limits; but, de jure, no evidence whatever of title to things not then within those limits.    The clause of the constitution of the United States referred to was not designed to extend the jurisdiction of local courts, or to extend beyond its just limits the operation of a local decree; but to provide a mode of authenticating evidence of the record of a judicial proceeding had in one state, so that the proper general result of it might be conveniently attained in every other state, against persons and things justly within the range of the proceeding.    Notwithstanding this clause, a judgment in a suit between parties is, as such, void out of the state, as to parties not personally served, and not appearing to defend within the state whose court renders the judgment; although if the suit be commenced by attachment of things within the state, it is, without such service or appearance, good as a judgment in rem against those things, to condemn them to satisfy the judgment.    As little does this constitutional provision extend the jurisdiction of a municipal court of probate to things beyond the limits of the state which sets it up, and is quite satisfied, in our judgment, ''with leaving the probate of a will where it finds it, a decree local in its nature and operation'': Olney v. Angell, 5 R. I. 198, 73 Am. Dec. 62.

In this last cited case the same court said that it is old law that a will made in a foreign country and proved there must also be proved in England in order to dispose of personal property in England: Lee v. Moore, Palm. 163; Tour-

ton v. Flower, 3 P. Wms. 369; Vanthienen v. Vanthienen, Fitzg. 204.

Following this rule so early established and so fully carried out in the mother country, we apprehend it to be equally well settled by the decisions and legislation of the country that the effect of a decree proving a will, like that of a decree granting administration, is confined de jure to the territory, and things within the territory, of the state setting up the court. In their nature such decrees are decrees in rem passed by courts deriving all their authority from the state which institutes them, and, necessarily, in great part upon constructive notice only to those interested in the decrees; and it is difficult to see how a wider operation could be allowed to them, consistently with a just attention to the rights and claims, to the property of the decedent, of citizens of other states in which the property was at the time of his death. Whatever other operation is allowed to them is a mere matter of comity, which every state is at liberty to yield or withhold, according to its own policy and pleasure, with reference to its own institutions and the interests of its citizens: Boston v. Boylston, 4 Mass. 318; Goodwin v. Jones, 3 Mass. 514, 520, 3 Am. Dec. 173, Parsons, C. J.; Pond v. Makepeace, 2 Met. 114; Doolittle v. Lewis, 7 Johns. Ch. 45, 47, 11 Am. Dec. 389; Strong v. Perkins, 3 N. H. 517; Kittredge v. Folsom, 8 N. H. 111; Ives v. Allyn, 12 Vt. 589; Woodruff v. Taylor, 20 Vt. 65, 73; Budd v. Brooke, 3 Gill, 198, 43 Am. Dec. 321; Ward v. Hearne, Busb. 184; S. C., 3 Jones, 326; Wilson v. Tappan, 6 Ohio, 172; Bailey v. Bailey, 8 Ohio, 239; Embry v. Millar, 1 A. K. Marsh. 303; Sneed v. Ewing, 5 J. J. Marsh. 565, 22 Am. Dec. 41; Darby v. Mayer, 10 Wheat. 465, 469, 6 L. Ed. 367; Armstrong v. Lear, 12 Wheat. 169, 175, 176, 6 L. Ed. 589; Vaughan v. Northup, 15 Pet. 5, 10 L. Ed. 639; Stacy v. Thrasher, 6 How. 59-61, 12 L. Ed. 337; McLean v. Meek, 18 How. 16, 15 L. Ed. 277; Story on Conflict of Laws, 425, note and secs, 512-514a, and p. 431, note; 1 Williams on Executors, 204, note 1.

The legislation, we believe, of nearly all the states and certainly of our own, proceeds upon the supposition that such is the limited operation of a probate of a will had in a foreign

country or in another state; and provides some mode, in general analogous to that pursued in England with regard to a will which has received a Scotch probate, by which conclusive operation may be given to such a will within the state, full notice being given to all persons interested in order that they may appear and contest the validity of the same: R. I. Rev. Stats., c. 155, secs. 5-10; Dublin v. Chadbourn, 16 Mass. 433; Laughton v. Atkins, 1 Pick. 535; Trecothick v. Austin, 4 Mason, 34; Fed. Cas. No. 14,164; 1 Williams on Executors, 205, note, 1; Story on Conflict of Laws, sec. 513, and note 1, and cases cited.

We do not apprehend that article 4, section 1, of the Constitution of the United States extends to the operation of a probate of a will, as a judicial act of a state, beyond its own territory. "Full faith and credit" is given to such a decree when it is left where it is found, local in its nature and operation.

In Rhode Island, from which state the foregoing remarks are appropriated, application must be made to the court to permit the authenticated copy and probate to be filed and recorded. Notice must be given as in the case of an original application for probate. If no objection is made, or none in the judgment of the court sufficient to prevent it, the court shall cause the copy to be filed and direct it to be recorded, when "the filing and recording thereof shall be of the same force and effect as the filing and recording of an original will, proved and allowed in the said court of probate; but no such will is valid unless executed, subscribed and attested according to the local law." In Pennsylvania the foreign will, when a copy thereof duly authenticated is proved in that state, has the same effect as if it had been originally proved therein.

In California when a copy of the will and the probate thereof duly authenticated is produced by the executor or by any person interested in the will, with a petition for letters, the court must appoint a time for the hearing, of which notice must be given the same as for an original petition for the probate of a will.

If, on the hearing, it appears upon the face of the record that the will has been proved, allowed and admitted to probate in any other of the United States, or in any foreign country, and that it was executed according to the law of the place in which the same was made, or in which the testator was at the time domiciled, or in conformity with the laws of this state, it must be admitted to probate and have the same force and effect as a will first admitted to probate in this state: Code Civ. Proc., sec. 1324.

It has been shown conclusively in this case that the domicile of the decedent at the time of his death, and for a long period prior thereto, was in this city and state, and that he left personal estate therein, and in that case, it seems, this court is not bound to receive such a document as the Philadelphia record to destroy its own title to jurisdiction. In such case it is doubtful whether such a record can be admitted at all in evidence, for it is said in the notes to Bowen v. Johnson, cited by contestant, that the original will itself must be produced in the court of the state where the actual domicile was at the time of his death; but however this may be, I cannot concur in the conclusion of contestant that the foreign record has the force and effect claimed for it by him on this application. It is not a bar to this proceeding.

As to the alleged will itself, it is claimed by contestant that the document bearing date the sixth day of April, 1901, is not the last testament of decedent; that he never signed or executed the same; that he was not of sound mind at the date thereof; that it was not signed in the presence of the alleged subscribing witnesses; that the statutory requirements were in no particular observed; that the signature of this paper is utterly unlike any of the exemplars in this case; none of the checks contains a signature so feeble in form or so lacking in characteristics as the one found on this paper; no satisfactory explanation has been given of the appearance and condition of this paper; it was mutilated in a manner not explained by the evidence. Contestant claims that decedent at the time of the alleged execution was thoroughly saturated with and sodden in liquor; he was a dipsomaniac; he was so diseased by the use of intoxicants habitually that his mind

and brain were incapable of intelligent operation. The competency of the mind must be judged by the nature of the act to be done; the act must be volitional, not merely mechanical. Contestant insists that the testimony of the witness Morgan Smith as to cutting the top of the sheet and the character and appearance of the paper indicate that it was tampered with; it may readily be seen how easy it would be to fabricate such a document; it is not difficult to understand the process by which this could have been manipulated; the appearance of alteration has not been adequately accounted for: Code Civ. Proc., sec. 1982; Schouler on Wills.

As to the signature of Max H. Kershow to the document, Carlton M. Kershow, the contestant, testified in his cross-examination that it was probably the handwriting of his brother, the decedent, although he had a doubt as to the terminal letters "ow"; but notwithstanding dissimilarities between this signature and those in the standards, the characteristics are the same, and it cannot be concluded on the evidence that decedent did not write his name on the paper propounded.

Whether decedent signed it intelligently or automatically is another question.

Whether the act was mental or mechanical, Max H. Kershow wrote his name on that paper.

The strictures of contestant on the appearance and condition of the paper itself and the doubts thrown upon the execution would not be too severe as matters of first impression; but in the light of all the evidence this court cannot find them finally justified.

We have the direct and positive testimony of Morgan Smith that he drew the will at the dictation of decedent on the evening of the 5th of April, 1901, and that on the next morning it was signed by the testator, and the attestation clause dictated by him and written by Smith, when the latter and Meadows signed as subscribing witnesses.

Smith swears that he went to the apartments of decedent on the evening of the 5th of April, 1901, at about 6 o'clock; dined there that evening with Mr. Kershow. Alice Kennedy also dined there but had her dinner separately; no one else was there but the waiter; Alice left at about 8 o'clock, ac-

cording to the clock in the room; John Roland was not there at all that evening; at about half-past 9 or 10 o'clock decedent said to Smith, "Morgy, get some paper; I want to do some writing; I want to make my last will"; Smith got a tablet and made several drafts at decedent's dictation; this was between half-past 8 and 10 o'clock; he made a half a dozen drafts and tore them up; the decedent was trying to revive his law memory, he having been a law student in Harvard; finally Smith finished the paper in ink, on a piece of legal cap he had in his pocket among his insurance papers; then decedent said two witnesses were necessary, and they discussed names with reference to their fitness and their liability to keep their own counsel, at length settling on Meadows, and Smith went out to find him, and saw him but he could not come until next morning; Smith left Kershow's apartments at about a quarter or half-past 10 and returned at 1 o'clock and slept with him that night, arising at about 8 o'clock next morning, no one else being there; at about 9 o'clock on the next morning, April 6, 1901, Mr. Meadows came in; Mr. Kershow was awake and said to Meadows that he wanted him as a favor to act as a witness to his will; that it was a matter of the greatest secrecy, as if any of his folks knew he was about to make a will they would try to prevent him; he then read the will aloud, remarked on the misspelling of his brother's name with an initial "K," but said it would make no difference; he then said that an attestation clause was necessary; decedent first signed his name, then Smith took the document and added the attestation clause at the dictation of decedent; then at his request and in his presence and in the presence of each other Smith and Meadows signed their names as witnesses, decedent declaring it to be his last will and testament; Smith added the date in writing; on the evening before, while Smith was engaged in making the drafts, Kershow said that his law memory was rather bad but he thought he was able to draw his own will; Kershow was sober absolutely when he signed the will, as well as the night before when he dictated to Smith the terms of the instrument; he was sound in mind and acting of his own free will; after the execution Smith asked a waiter to

ring for a messenger and one appeared at about 11 o'clock, by whom he sent a message to A. B. Forbes & Son, the messenger returning in fifteen or twenty minutes with a check from them; Smith took the will and put it in his trunk in his room and kept it there until he moved to Sausalito, June 15, 1901, when he put it in his desk at the office in the Crocker building, where it remained until the day of the death of Kershow, when he took it to the office of Mr. Kowalsky and gave it to him; between the time of writing the will and the day of the death of the testator Smith swears he never spoke to anyone concerning the transaction. Smith testified that Roland was not at or in Kershow's rooms on the nights of the 5th, 6th and 7th of April, 1901; Smith remained there for several days because his eye had been injured and he thought it prudent to remain inside until the injury was repaired. With regard to the appearance of the paper Smith said he cut off the margin of the sheet on which the will was written—the left-hand margin—because ink had been spilled on it. Subsequently in his testimony he said that he divided the sheet of legal cap at the top by a knife held vertically and cut off the margins in the same manner; this he did before the occasion of writing the will; he did it in the insurance office; he had several sheets of legal cap which he used for making "prospects" of policies on; he had it in his left hip pocket with his insurance papers, and one day he took out the sheets and laid them on his desk upon which some one had spilled some ink and shoving the papers to the left side, not noticing the ink, the sheets became soiled, and some of them spoiled, and he cut the margin of some to save the paper; that is how this particular half-sheet became cut on the left margin; Smith did not know where he obtained the legal cap originally, it might have been in Gamage's office, which he sometimes visited—the office of Jules C. Gamage, the collector.

Meadows sustained Smith as to what occurred at the time of the transaction, and declared that Kershow was perfectly sober on that occasion and drank nothing during that time and was sound in mind.

It may be said that the witnesses, except the parties and the witness on the stand, were excluded from the courtroom during the taking of testimony.

As against these subscribing witnesses the contestant relies on Alice Kennedy, maid-servant, and John Roland, man-servant, of the decedent, to show that the story of the drafting and execution was absolutely untrue, and impossible because neither Smith nor Meadows was there on the occasion sworn to by them, as John and Alice were there all the time and knew all the facts.

Dr. Wagner's evidence is also relied upon to demonstrate that the condition of the decedent was incompatible with soundness of mind at the date of this document; that he was so debilitated in mind by his habits of drink that any manual action was automatic and not responsive to intellectual impulse. Contestant maintains that the doctor's observation was acute and constant and friendly, sympathetic and accurate.

Roland testified that he was in the service of decedent for two years, serving him at night, and that he was with him in his apartments all the time at night; he reported at 6 o'clock and then went to dinner and came back at 8 o'clock and remained all night; Alice was there during a part of each night; from the 1st of April to the 24th of April, 1901, decedent was in bed all the time; Roland saw Kershow nearly every day for two years and believed he was unsound in mind in April, 1901; on the night of April 5, 1901, decedent was very wild in mind, he had visions; he was not then of sound mind; this condition lasted some four or five days; during that whole night the mental condition of decedent was unsound; when Roland left on the morning of the 6th at about 8 or half-past 8 o'clock Alice Kennedy was there; Roland went there at 6 o'clock in the evening and reported and came back at 8 and washed decedent and then went away and returned at 10 o'clock and remained all night; hypodermic injections were given to decedent about every night, usually about half-past 9 o'clock; in the daytime Roland worked for Dr. Wagner; from the time Roland went into Kershow's room on the evening of April 5, 1901, until he left

on the morning of the 6th no one came in there except Dr. Renz.

Roland testified that he gave Kershow whisky whenever he wanted it, whether he was insane or drunk; he sometimes put water into it, decedent always drank water after his whisky; it is a fact that he could not keep the whisky on his stomach. On the occasion of decedent's birthday there were present Ada Thall, Alice Kennedy and Roland; no one else was present at that time. Roland testified that his first check from decedent was at the Maison Riche; it was for $20; the second check was at Tortoni's for $15; this was the only check decedent gave him at Tortoni's; that was in 1901; Roland swore that he could not be mistaken about that, only one check at Tortoni's. Two checks were exhibited to witness and the indorsement identified as written by him: "John E. Roland," checks dated March 29, 1901, for $23, and May 21, 1901, for $10. At these dates decedent was living at Tortoni's; Roland said that the decedent was always drunk when he was with him; when he wrote those checks he was drunk, under the influence of whisky, in a mild form; decedent was in bed when he wrote those checks. When decedent made up his mind to do anything, Roland said, he always did it. Morgan Smith was seen by this witness dining at Kershow's rooms more than twenty times in 1901.

Alice Kennedy worked for decedent at the Maison Riche and at Tortoni's; he was drunk all the time at the Riche and the same at Tortoni's; he drank constantly; his favorite was Hunter Rye Whisky; he drank also beer, absinthe, and white wine; he was of unsound mind; from the 1st of April until the 24th he was unable to go out at all; Morgan Smith was not in that room during all that time and she never saw A. J. Meadows. On the 5th and 6th of April, 1901, decedent was of unsound mind; on the 7th he was a little better, his mind was a little more settled, not so flighty; there was a person called Ada there for some time at times; her name was Miss Ada Thall; she was there on his birthday, the 24th of May, as near as Alice could remember; she was there on the date that Alice went to the steamer with Miss Gettings;

came there two or three days before Kershow's birthday, and remained until the day before he died, when she was sent home. It is in evidence that Miss Gettings left for China May 29, 1901. Alice said she never knew Mr. Morgan Smith to do any writing for Mr. Kershow; decedent told her at the Maison Riche that his birthday would be April 24th; he told her also at Tortoni's; on both occasions he told her before his birthday had arrived; at the Maison Riche he drank absinthe, beer, wine, whisky, mainly whisky, that was his favorite, but he could not keep it on his stomach, which was burned out. Alice sometimes put water in, but he was very cute about his whisky, one could not fool him on that; at Tortoni's he drank more whisky than at the Riche; he was liberal with his liquor—everybody that came had a drink; the effect of the liquor was very bad on him the whole time at Tortoni's; he was a very friendly gentleman, indeed; he was a lovely man; he would join in the conversation with John and her. One day was very much like another at Tortoni's, no great variety. John Roland used to come in at about 6 o'clock in the evening and would remain for dinner; John and Alice would have dinner there together; they would be so engaged at the table until about half-past 8, not always eating but it would take some time to obtain dinner after ordering and they would sit there talking and Mr. Kershow would engage in their talk, would joke and laugh; he was very sociable, liked company and liked to entertain his friends; he sometimes imagined he saw things, would get up and hunt around, and Alice would ask him, "What is the matter, Mr. Kershow?" and he would say, "Is that you, Alice?" and say he thought somebody was there, and she would say "No," and lead him back to bed; he would recognize her. Alice testified that April 7th of this year (1901) was on a Saturday, and that the mental condition of Kershow was about the same on that day as the day before, he was a little better; she afterward corrected her statement as to the date and said she was in error when she stated that the 7th of April was a Saturday; it was Sunday—Easter Sunday— there was not much change in him on that day; he was about the same, a little flighty at times; she could not remember

anything particular he did from day to day; he would keep on drinking, sometimes he would brace up a little and say he wanted to write to his brother, the "Kid," as he called him, whom he wanted to come and straighten out things, as he had run so far behind in his affairs; then he would resume his habit of drinking; Alice never saw Morgan Smith do any writing in Tortoni's; in the Riche he used to come in and ask for a piece of paper and sit down and scribble off something, a letter to his friend, he would say, and then leave. At the time Jule Gamage came to see her at her flat he asked her to go in with the will and she would have a thousand dollars; she told Gamage that Mr. Kershow did not leave any will except the one he gave to Mr. Michael; he made no will while she was there and she was there with him all the time. Alice said that Getz's barkeepers did not dine there. At the time Alice was being interrogated as to dates she was observed consulting a card hidden behind her satchel, which, upon demand of counsel for respondent, she revealed, saying that it was a card with her name, Alice Kennedy, and written upon it, "Born: Aug. 16th, 1867. Married, June 5, 1900." This was on the obverse side, referring to her birth and marriage; she stated that she had in her satchel this card and had looked at it during her testimony as to dates; it was in her husband's handwriting, except the figures "1899" on the name side, which were written by her.

Dr. Henry Louis Wagner testified he knew the decedent when he was living at the Palace Hotel and the Maison Riche; he had to refer to his visit-books to refresh his memory as to dates of professional visits; he saw the decedent on the 5th, 6th, and 7th of April, 1901, at Tortoni's and also on the 4th and 8th of April; the entries in his books were of purely professional visits; the witness was there thirty times in April and always saw Alice there; he was never there after 10 o'clock in the evening; sometimes his "man" Roland would be there. The doctor knew decedent since 1899; he visited him at least fifteen times during the month of April, 1901, socially, as a friend, in addition to his thirty professional visits in that month; at least every second day he called upon him in a social way; the doctor spoke to him

upon a variety of subjects; decedent frequently asked the doctor's advice upon matters unconnected with his ailments; he had called at the doctor's office to speak to him upon other matters. The doctor first formed decedent's acquaintance in April, 1899, on a professional visit. Dr. Wagner formed an opinion as to Kershow's soundness of mind in April, 1901, based upon observations in his social visits apart from information acquired by him as necessary to prescribe; in the opinion of the doctor the decedent was unsound in mind; he had hallucinations. Dr. Wagner testified he was a surgeon and made a specialty of surgery of the head, neck, throat, and brain, but was not an alienist. The decedent was addicted to drink; the witness treated him for various troubles, an infraction of the skull; a wound over eye; ear troubles, and inebriety. In cross-examination Dr. Wagner further testified that in the visits made by him to decedent he remained often from fifteen minutes to two hours; he often went to visit him in a friendly way in March, April, and May, 1901; decedent was in a stupor frequently and incompetent to intelligently interpret or intelligibly communicate his ideas; in fact, decedent was mentally incompetent. Dr. Wagner testified that decedent drank a great deal; Kershow was originally a bright man, of good instincts, who had when he came to San Francisco two and one-half years ago, streaks of brilliancy and inspired hopes of cure, and the doctor had some confidence in his reclamation; he became greatly interested in him, took a friendly interest in him; at the beginning the doctor tried hard to convince decedent that he should cease drinking; his arguments were unavailing, however, and when Dr. Renz took charge of the case Dr. Wagner gave up his efforts and told Dr. Renz that he might try his own theory. Dr. Renz thought he might effect a cure by hypnotism and by injections of strychnia, but Dr. Wagner became disgusted with his own ill-success and so quit his efforts in that direction; by unsoundness of mind Dr. Wagner meant where a man has lost his reasoning powers; Mr. Max Kershow had strong will power. A letter written in pencil by Max Kershow to his brother Carl, dated May 21, 1901, about bill of Dr. Wagner, was shown to this witness;

in reference to this letter the doctor said that he had written out his account or bill some time previously, and subsequently sent his man Roland to collect it. In the opinion of Dr. Wagner, Mr. Max Kershow was devoid of reason during March, April, May, and June, 1901; decedent may have had reasoning power and yet have been at the same time unsound in mind; at the minute he wrote that letter he may have had reasoning power; the doctor discussed business with decedent in 1900; decedent was very suspicious in everything he did and in every transaction; small in every possible way.

The letter shown to Dr. Wagner is as follows:

"San Francisco, May 21, 1901.

"My Dear Carl—

"Dr. Wagner wrote to you about his bill and I must have same way of paying it off, also that of Dr. Renz which will be surely as large. Can you not find out what my balance at the Trust Co. is and telegraph the amount to me at Palace Hotel. The Maison Riche closed and I have been living at Tortoni's for some months. My dear Carl, I am compelled to have some money to live on, as I only have a small sum at present (about $50.00) and I want you to consult with Uncle Harry and dispose of a piece of my interest in Denver. You of course can buy it out. I will have Mr. Michael make out a power of attorney for you and you can give me a certain sum as an allowance, until I am myself again. It would be much more satisfactory if you could come out here but I suppose that is not convenient for you. At least find out my balance at Trust Co. and telegraph it to me as I must have the money at once. I have not written to you for the reason that I have been so sick that I could not. Dr. Renz has just kept me alive. He wants you to come out.

"Your brother,

"MAX H. KERSHOW.

"I enclose check so you can draw out balance.

"MAX."

At the minute he wrote that letter, Dr. Wagner says, the writer may have had reasoning power; he may have had

reasoning power and yet have been unsound in mind at the same time. The doctor had previously said in his testimony that by unsoundness of mind he meant where a man had lost his reasoning powers and that in his opinion Max Kershow was devoid of reason during the four months of March, April, May, and June, 1901—and it was during this period that the letter hereinbefore inserted was written. This letter was a continuous performance, which must have occupied its writer for several minutes; in fact, it must have approximated fifteen minutes in its composition and execution.

Dr. Wagner's testimony was taken under objection, on account of his professional relation to decedent, and it is difficult indeed to separate his professional from his social relation, but his idea of his patient's soundness of mind may be considered here in connection with the accepted definitions.

By the mind of man we understand that in him which thinks, remembers, reasons, wills. Will, memory, and understanding are usually denominated the constituents of the mind. The principal faculties of the human mind are called, respectively, the understanding and the will. A person is of sound and disposing mind who is in full possession of his mental faculties, free from delusion and capable of rationally thinking, acting, and determining for himself.

Lord Chief Justice Cockburn, in the course of his opinion in Banks v. Goodfellow, said: "Everyone must be conscious that the faculties and functions of the mind are various and distinct as are the powers and functions of the physical organization. The instincts, the affections, the passions, the moral sense, perceptions, thought, reason, imagination, memory, are so many distinct faculties or functions of the mind."

In considering testamentary capacity in the same case, he said further: "It is essential to the exercise of such a power that a testator should understand the nature of the act and its effects; shall understand the extent of the property of which he is disposing; shall be able to comprehend and appreciate the claims to which he ought to give effect; and with a view to the latter object, that no disorder of the mind should poison his affections, pervert his sense of right, or prevent

the exercise of the natural faculties; that no insane delusion shall influence his will in disposing of his property, and bring about a disposal of it which, if the mind had been sound, would not have been made. This is the measure of the degrees of mental power which should be exacted.''

Maudsley, in his work on Responsibility in Mental Disease, says that this decision of the court of queen's bench, which practically is that an insane man may sometimes make a sane will, agrees so far with the older decisions as that the will itself, if appearing to be a rational act, rationally done, was held to be evidence of a lucid interval.

What is a ''lucid interval''? Dr. Wagner had not heard of the term before the trial of this case; the institutions in which he had been instructed had not comprised in their curriculum the study or treatment of diseases of the mind, and, while the doctor is an eminent surgeon and distinguished in his specialty, he does not profess to be an expert in alienism, and did not seem to comprehend the phrase ''lucid interval'' until it was explained to him as a period of mental clearness enjoyed by an insane person, during which he is capable of performing an act binding in law; it is an interval during which the patient is restored so far as to be able, beyond doubt, to understand and to do the act, with such reason, memory, and judgment as to make it legal. In the opinion of Dr. Wagner, Kershow enjoyed no such interval for the four months during which he wrote the letter of May 21, 1901, and is said to have dictated and executed the paper here propounded as a will dated April 6, 1901, which may be here inserted as follows:

''I, Max H. Kershow, being of sound and disposing mind, declare this to be my last will and testament, hereby revoking all former wills by me made. I give and bequeath to my brother Karl $5,000.00 to each of my uncles, J. Henry Kershow and P. Kershow $1,000.00, to my servant Alice Kennedy, $1,000.00, to my friend J. Morgan Smith $500.00. The rest of my estate real and personal wherever situated, after paying the above bequests and my just debts, I bequeath to my sincere and devoted friend Rhea Gettings.

"I nominate and appoint as one of my executors of this my last will and testament Hall McAllister together with Rhea Gettings as executrix without giving bonds.

"MAX H. KERSHOW.

"We, J. Morgan Smith and A. J. Meadows, have signed our names as witnesses to this the last Will and Testament of Max H. Kershow at his said Kershow's request and in his presence and in the presence of each other.

"J. MORGAN SMITH.
"A. J. MEADOWS.

"April the sixth nineteen hundred and one."

At the time Kershow wrote that letter he must have been in possession of his faculties; it was a rational act, rationally done; all the mental processes are there carried forward logically and relevantly; he shows an appreciation of the magnitude of the physician's charges and an apprehension based upon that account of as large a bill from the other physician, and a desire to provide for a discharge of the indebtedness; he wishes to be advised of the balance at his bankers in the east, knows the amount he has on hand locally, advises a consultation between his brother and his Uncle Harry as to a sale of property in Denver; intimates that his brother can make the purchase himself; says that he will have his attorney make out a power for his brother who can then give him a certain sum as an allowance until he is himself again; says it would be much more satisfactory if his brother could come out here, but supposes that it is not convenient; again requests that he ascertain the balance at the bank and telegraph it out as he must have the money at once; gives a reason for not writing because of his sickness; says that Dr. Renz has just kept him alive and that the doctor wants Carl to come out; subscribes himself dutifully and with his full name, adds a postscript inclosing check so his brother could draw out balance.

In this letter the writer seems to have been able to intelligently interpret and intelligibly communicate his ideas. It can scarcely be said, as a responsible utterance, that the writing of that communication was a manual act, purely automatic and not responsive to intellectual impulse. Every element en-

gaged in, the definition of a sound mind enters into the structure of that letter. The letter speaks for itself and needs no further comment. Whatever the writer's condition at other times may have been, this letter must have been produced during a lucid interval; but the doctor says that decedent may have had reasoning power and yet have been unsound in mind; this statement imports a contradiction in terms, as does the statement that decedent had strong will power and yet was unsound in mind.

Dr. Wagner's own testimony shows that when the man was sober he was sane; for the doctor spent hours with him socially, argued with him over his prevailing vice without avail; had conversations on business with him in which the doctor discovered that decedent was very small and suspicious in everything he did and in every transaction. It appears that in one affair the doctor and decedent differed widely as to the value of a ranch which the former desired to dispose of to the latter; decedent thought the price too great and it was not the kind of a ranch he wanted and he declined to purchase; this seems to signify sanity rather than the opposite; in this he seemed to have been capable of rationally thinking, acting and determining for himself as to the value and character of the property, and it appears that the doctor by his negotiations, conversation and acts was willing to deal directly with decedent in so important a matter.

It appears, then, from the doctor's own statement that at times the decedent had reasoning power, a strong will, and a sense of property values; he knew what he was about and, as John Roland, "the doctor's man," and the man-servant of decedent testified, when Max Kershow made up his mind to do anything, he always did it.

It appears from the testimony of the doctor's man that the decedent had a stubborn spirit; the doctor said he had a strong will and a suspicious nature; they both agree that he was of unsound mind.

Alice Kennedy was of the same opinion as to soundness of mind, but testified that decedent was a liberal, kindly disposed man, a very friendly gentleman; "a lovely man," sociable, generous in the entertainment of his friends, the

soul of hospitality, fond of jest, agreeable in conversation, joining before and during the dinner hour in genial talk with her and Roland, joking and laughing, and making his pleasant presence felt by everyone—servant as well as guest; and yet he was drunk all the time at Tortoni's and of unsound mind and unable to leave his room from the 1st of April to the 24th of that month by reason of his condition.

With reference to these two witnesses, John Roland and Alice Kennedy, it may be said that there are frequent infirmities in their testimony which weaken its general effect. There are contradictions from within and without. Roland is contradicted in an important item by his employer, Dr. Wagner, with respect to the time of arriving in the morning at the doctor's office; he is also contradicted upon a vital point by Alice as to the time when he came and went on the 5th of April, 1901; she swears she asked Roland to come early on April 5, 1901, because she wanted to go somewhere; she asked him the day before, he did not come and she did not go anywhere else; she remembered the event and the evening because it was the eve of her child's birthday; but their tales of the time of coming and going do not tally; they are diametrically opposed and cannot both be true. Alice Kennedy's memory as to dates was more than imperfect; even when her testimony as to dates was shielded by the card concealed within or behind her satchel on the witness-stand, she was uncertain; without the memoranda she was helpless as to dates of important incidents and occurrences in her own career; her recollection in this respect was untrustworthy; her evidence in her divorce suit against her first husband Green does not comport with what she said on this trial as to dates; the discrepancies are too great to be ignored or excused; she contradicted herself in many essential particulars as to events in her own life which should have fastened themselves imperishably on her memory; how, then, can she expect to be accepted with reference to matters with which her connection was collateral and of inferior importance to those of her domestic personal concern?

Roland and Alice are contradicted with reference to Morgan Smith's presence at the rooms of decedent in April, 1901.

Moses Getz, the saloon-keeper, testified that he visited Kershow nearly every day in that year and in that month at Tortoni's, and that nearly every time he saw Smith there. Getz said that decedent was careful in business matters, although he spent money freely at the saloon; opened wine to the extent of $150 a night at times; this witness lent money to the decedent as high as $100 at a time, amounting sometimes in the aggregate to $400 or $500, all paid back; decedent always paid his debts; Getz remembered that in April, 1901, decedent had his birthday and induced the witness to let his barkeepers go up to dinner with him at Tortoni's, Getz remaining at work in their place; they came back at about 9 o'clock with some cake which they said was birthday cake, and Kershow followed soon after; this was in the latter part of April, 1901. Getz thought the decedent was sound in mind, basing his opinion on observation and conduct. The barkeepers, Simmons and Crayton, testify to visits to Tortoni's and to the dinner spoken of by their employer. Simmons swore that he often visited Kershow at his rooms; decedent frequently invited him to dinner and they dined together at Tortoni's; Alice Kennedy and John Roland, the maid and the man, were usually present; on decedent's birthday in this year Simmons had dinner with decedent at those rooms; there were five persons present—Mr. Max Kershow, Alice Kennedy, John Roland, William Crayton, and this witness; Simmons believed that a young lady, Ada Thall, partook also of the dinner; the rooms at Tortoni's comprised a dining-room, bedroom, and bath; decedent sat at the table set in the dining-room; he was not drunk; he showed what he got for his birthday: cake from the proprietor, flowers and old Spanish wine; Simmons remained there from 6 to 9 o'clock that evening, when he returned to his work, leaving Crayton behind; Simmons went on duty until 12 o'clock, but did not see decedent again that night; from his acquaintance with Kershow he thought him of sound mind; decedent was oftener sober than drunk.

Crayton, the other barkeeper, corroborated his associate as to the birthday dinner party and added that after Simmons left there he remained until about a quarter to twelve mid-

night; when Crayton left Tortoni's he was accompanied by Kershow and the man-servant Roland; they went down to the Manhattan saloon together; previous to that night and in the same month Crayton had seen decedent in that saloon on two or three different occasions; from what this witness saw of him he thought Max Kershow was of sound mind; Crayton had seen Morgan Smith in the rooms at Tortoni's two weeks before Mr. Kershow died; Crayton says that when he saw Kershow he was sometimes sober and sometimes under the influence of liquor; three or four times the witness saw him when he was absolutely intoxicated. Alice Kennedy swore that these two barkeepers, Simmons and Crayton, did not dine there on the birthday, although on the evening of that day Henry Simmons brought a bunch of flowers to Kershow.

The date of the birthday of decedent is fixed by the evidence as April 24, 1901, which was Wednesday.

Alice reiterated that neither of the barkeepers was there at dinner on that occasion, and that those who partook of the meal were decedent and the girl Ada, John Roland, and herself; Simmons did not stay for dinner; he just came in with the flowers, left them, and went out again.

The story of Alice as to the visit of Jules Gamage to her on the morning of Max Kershow's death is contradicted by Gamage, who declares under oath that he did not call at her house nor on her on that morning nor on the next, nor did he have any conversation with her on either of those occasions or days at her house or elsewhere, or at any other times, and never said anything to her about a will or that she should get $1,000 by the will, or that she ought to call on one of the attorneys; Gamage did not see nor converse with her on that topic, and he did not even know at the time she alluded to of the death of Kershow. It appears that decedent died at fifteen minutes after midnight, and none of the witnesses for the proponent knew of the decease until long after the hour at which Alice swore that Gamage called to see her and made the proposition that she rejected.

Max H. Kershow was a man of honor, in his way; he was mindful of his financial obligations, and inclined to be

punctilious as to their discharge to the last penny; he may have wasted much on wine and women, but, if we are to accept Dr. Wagner's estimate of his character, he was otherwise a cautious, prudent business man, for such is the deduction from the doctor's declaration that decedent was a suspicious and a distrustful person, who never paid out a dollar without a doubt or demur. He was evidently anxious, however, for he adjured his brother Carl to provide for the extinction of outstanding liabilities; among others certain notes to one Friedman. Carlton Kershow testified that Max said he would be glad if Friedman was paid, and upon that suggestion Carlton paid the notes; Carlton was at his brother's room about four or five days before the death when Friedman called there; Friedman suggested to Max that he owed him a certain amount, and Max asked Carl to fix it for him, $161 approximately; Carl paid before the death.

Carlton also paid some I O U's for his brother after some talk between them; the payment was made in his brother's front room. Carlton had previously in his testimony, some ten days before, giving an account of these transactions, expressed his belief that by reason of his habits his brother Max was out of his mind; Carlton believed that Max was insane as the effect of continued indulgence for years in intoxicants and narcotics, and he said that his brother was constantly under the influence of drugs or intoxicants for the last two weeks of his life, and that morphine was administered to him hypodermically by Dr. Renz.

Dr. Renz was not examined as a witness in this case, it appearing that he was obliged to go abroad abruptly without affording an opportunity to take his deposition.

It was during these two weeks during which Carlton Kershow testifies that his brother was constantly under the influence of liquor and drugs, out of his mind, insane, that the decedent requested his brother to pay Friedman and arrange for the payment of the I O U's.

Alice Kennedy admitted that she knew a Mr. Friedman, a jeweler on Stockton street; "he visited Mr. Kershow once or twice."

What does Mr. Friedman say on this subject? Ralph Friedman testified that he was forty-two years of age, a

dealer in diamonds and jewelry at 25 Stockton street; knew the deceased, Max Kershow, who lived for a while at the Maison Riche; Friedman sold to Kershow diamonds to the amount of $275; sold him a sunburst and a silver cigarette-case on Christmas Eve, 1900; decedent was then staying at Tortoni's; witness had dealings with him in the year 1901; advanced him some money; decedent sent for witness and he went to the rooms at Tortoni's; decedent was in bed and asked witness if he would lend him $100. Friedman said "Certainly," and let him have that sum, for which he gave his note; subsequently Kershow directed Friedman to let Miss Gettings have $50, and witness did so, taking his note for that; afterward witness was repaid by decedent's brother in the rooms of Max Kershow at Tortoni's, the brother Carlton in one room and Max in the other. Friedman let Max Kershow have the $100 in the latter part of April or first part of May; the notes were paid about five or six days before he died; five or six days before the payment Friedman heard that decedent wanted to see him and he went to the rooms at Tortoni's; there were present Mr. Max Kershow in bed, his brother, whose name witness did not then know, and Alice Kennedy, the maid; Mr. Max Kershow asked Alice to step out into the next room, as he had some business with witness; she went out and Max Kershow then said to his brother, calling him by name, that he owned witness $100 and $50 on two notes, and $4 for a nugget, which he wanted paid; the transactions of witness with Mr. Kershow were personal; he took no collateral for the loans; the $50 matter was in May; Friedman was frequently in the rooms of Kershow in Tortoni's; he was there in each month in 1901 prior to the death; sometimes he saw decedent every day for a while and sometimes two or three weeks may have elapsed; he spent as much as half an hour at a time with decedent; Kershow would be smoking and drinking at times; in the opinion of Friedman decedent was of sound mind and sober when he saw him; the opinion of his soundness of mind was based upon the observation of decedent and his capacity for transacting the business witness had with him; Kershow was very careful in those affairs.

Alice Kennedy and John Roland concur in the statement that from the 1st of April until the 24th Kershow was unable to go out at all, and that Morgan Smith was not in that room during all that time, but Abraham Strauss, a cabman, testifies that on the 11th of April, 1901, he took Mr. Kershow from the Manhattan Saloon, 25 Geary street, to Tortoni's; there was a gentleman with him, Morgan Smith, and a lady, whom the cabman did not know; Strauss was called twice on the 24th of April, 1901, once on that day called to Tortoni's to take Kershow and a lady and a colored man to the Manhattan; Miss Gettings was not the lady on that occasion. Strauss knew Max Kershow two years, and saw him perhaps five nights out of seven in that time except when decedent was sick, and from his contact with him the cabman thought decedent was of sound mind. Kershow paid the cabman for the rides except the last one, which was paid for by his brother; the witness had with him on the stand his book to refresh his memory showing the dates of those rides.

Contestant's counsel says that the cabman Strauss evidently manipulated his memorandum-book, but, while the memoranda are crude and inartificial, the court is not convinced that they were concocted or manipulated. Strauss was to Kershow's rooms at Tortoni's many times; the number was 21 on third floor; when he took decedent home it was in the evening of April 11, 1901; it was between 7 that night and 1 the next morning. Strauss was in business for himself, hiring his own coupé, having headquarters at the southwest corner of Grant avenue and Geary street, and his hours were between 6 at night and half-past 5 in the morning. Kershow was generally full when the cabman took him in his coupé; he was more times sober than drunk; on the 24th of April, 1901, the first time that day Kershow was alone when Strauss took him from the Manhattan, the second time Morgan Smith and a lady were with him.

On one of these dates, April 11, 1901, that the cabman testifies that he took Kershow from the Manhattan saloon to Tortoni's in company with Morgan Smith and a lady, there appears to have been written and signed by decedent a check on a blank form of the Crocker-Woolworth National Bank

for three hundred dollars ($300), payable to "Cash" or order and canceled with the bank stamp as paid on that day.

Concerning this check, Morgan Smith testified that he was present when decedent made it out and signed it; he accompanied Kershow to the bank from the rooms at Tortoni's, where Smith had been sojourning with decedent; the two walked together to the bank, Kershow being feeble on his legs and his companion assisting him along; they stopped on the way down at the lower Louvre saloon to take a glass of beer and then resumed their walk to the banking-house two blocks below, on Market and Post streets junction, the Crocker building; they entered the counting-room and decedent went to a standing desk near the window, took out a check-book from his pocket, made out the check, went to the teller, received the cash and left the bank. At this time Kershow was absolutely sober, having taken nothing except the glass of beer. If Alice Kennedy and John Roland spoke the truth as to Kershow's continuous confinement in his rooms from the 1st to the 24th of April, 1901, Strauss and Smith swore to falsehoods concerning the incident to which they testified as occurring on April 11, 1901.

Some circumstances seem to incline the balance against Alice and John when their testimony is weighed against the main witnesses for proponent. The documentary evidence of the numerous checks drawn by decedent in the period from April 1st to 24th, 1901, when they testify he was constantly drunk, "drunk all the time," would seem to imply that he must have been to some extent in his senses, sufficiently so to understand that he had a balance at his bankers against which he could draw efficiently. On April 1, 1901, he drew a check payable to S. Constantini or order for $50; on April 11th, the check already alluded to for $300; on April 16th, S. Constantini or order for $50; on April 18th, same person or order, $50; on April 19th, same order, $25; again on April 19th, M. J. Getz, or order $25; six checks in all filled out and signed by his own hand.

It is idle to say that such acts were entirely automatic; they were the offspring of an intelligent design; he certainly must have known what he was about when he carefully filled in the spaces with the true date at the top, the accurate name

of the payee in its proper place, the amount in numerals with the fractional signs duly noted, the amount repeated in writing followed again by the fractions and subscribed with his name in full. His memory was in better form than that of Roland, who swore that the decedent gave him but one check at Tortoni's in 1901, and that he could not be mistaken on that score; only one and that for $15; and yet two checks were produced and identified by this witness bearing his indorsement and neither of them for the amount of $15, but for $23 and $10, and respectively bearing date March 29, 1901, and May 21, 1901. Roland swore that Kershow was always drunk when he was with him; he was drunk when he wrote those checks and in bed. Be it remembered that it was on the date of the second of these Roland checks, May 21, 1901, that Kershow wrote the letter to his brother Carl about the doctor's bill and other financial matters.

As against the testimony of Alice Kennedy and John Roland that Morgan Smith was not in Kershow's rooms on the night of the 5th or the morning of the 6th of April, 1901, there are corroborating circumstances and evidence to support the statements of Smith, who testified that he sent a message on that morning to his employers by a district messenger, as he did not want to emerge from the seclusion of those apartments on account of an injury to his eye and he wanted some money; he remained inside for several days on that account, and on the morning of the 6th he wrote a letter to A. B. Forbes & Son, and transmitted it through the messenger, received in reply on the same day a check, which was cashed by Caley and Roeder, saloon-keepers, on the corner of O'Farrell street and Grant avenue, on the 8th of April, 1901, the intervening date, the 7th being Sunday. As to this circumstance in corroboration of Smith we have the evidence of one of the proprietors of the messenger bureau, 294 O'Farrell street, William K. Lewis, who produced his books and the ticket or "tag" of a message sent out from his office April 6, 1901, which contained memoranda written by this witness, indicating that at 10:30 o'clock on that morning he sent out a message to 111 O'Farrell street, Tortoni's, by a messenger, No. 33, who returned at 11:10; Lewis gave the tag to the messenger, one Arthur Wil-

son, and received it forty minutes later from the same person. Arthur Wilson testified that was twenty-two years old, now an elevator boy, but in April, 1901, he was a messenger for the California Special Messenger Service; he received a call for Tortoni's, and went there and got a message from a man, whom he identified in court as J. Morgan Smith; it was between April 5 and 7, 1901, just after payday; the man had on a bathrobe, had a black eye, light red hair, smooth face; Wilson took the message to corner California and Montgomery streets; Wilson wrote on the tag in pencil after he returned to his office the words: "California and Montgomery Order": The tag reads as follows:

"No. 8490.                               April 6, 1901.
"California Special Messenger Service.
"111 O'Farrell Street.

| Messenger. | Out. | Returned. | Occupied. | Carfare. | Total. |
|---|---|---|---|---|---|
| 33 | 10:30 | 11:10 | 40 | | 20 |

"California and Montgy.
"Order."

When Wilson went to Tortoni's he entered the bedroom, waited there ten minutes for the man to write a letter; there was a woman there, colored, whom Wilson took to be a matron from her wearing a cap; he saw no one else there.

Stanly Forbes testified that he was the junior member of the firm of A. B. Forbes & Son, 222 Sansome street, corner of California street; their office was at the same place on the 6th of April, 1901, when he received a letter which he identified and which reads as follows:

"A. B. Forbes & Son, City.
"Dear Sirs:—
"Having been ill for a couple of days now and unable to get out and down town I ask if you may send by the returning messenger my advance, this being the 6th of the month. Being incapacitated so I am placed in rather embarrassed condition and I am greatly in need of the funds otherwise I would wait until I were again on my feet.

"Very respectfully,
"J. MORGAN SMITH.
"April 6, 1901."

That letter came from J. Morgan Smith, and in response to the request therein contained Forbes sent the firm check for $30, which is as follows with indorsement:

"San Francisco, Cal., Apr. 6, 1901.   No. 28381.
"The Bank of California,
"Pay to the order of
"J. Morgan Smith.                    $30‡
"Thirty‡....... ...... ..... ................. ..Dollars.
"A. B. FORBES & SON.
"The Bank of
"Paid
"Apr. 8, 1901.
"California.
"(Endorsements):

"J. MORGAN SMITH.
"CALEY & ROEDER."

The letter was handed to Forbes over his desk and he read it and wrote check and sent it by the same messenger to J. Morgan Smith.

The messenger located the office of Forbes and Son erroneously at California and Montgomery streets, whereas it was in the Mutual Life Building, on the corner of California and Sansome, one block distant.

Are Smith and Meadows to be believed? Is their story of the execution of the paper here propounded for probate probable? What is the evidence to challenge the veracity of their narrative?

At the date of the alleged will, decedent was about twenty-nine years old, he having been twenty-eight in the July previous, according to the statement made by himself to the registrar of voters:

"No. 21563.        Original.        Affidavit:
"Name in full:    Max Howard Kershow.
"Age: 28 years.    Height: 5 feet 8½ inches.
"Residence:   Maison Riche, 44 Geary street.
"July 19, 1900.

"Subscribed and sworn to before officer by
"MAX H. KERSHOW."

He had been well educated, having received his preparatory instruction at Ogontz, near Philadelphia, and pursuing a full course at Yale College, where he was graduated, and whence he went to Harvard Law School, spending two years in that institution. It will be seen that he had enjoyed exceptional advantages of intellectual education. In addition he had athletic tastes and training, and achieved the distinction of amateur champion of the world in pole vaulting. Other species of sport also had attractions for him, and gradually he was weaned from the higher life of the intellect and became addicted to habits and associations foreign to his natural and inherited conditions and influences, yet he never lost entirely his primal traits of character, although their growth and development were apparently arrested by the forces and influences surrounding him in his changed course of life.

Drifting into life along the line of sensual indulgence, he gradually lost his health and found his way to California in the fall of 1898, in an endeavor to repair his wasting strength and restore the vigor of his constitution. He found the climate congenial and with the exception of a trip to Honolulu for six weeks he made here his home. He lived first in the Palace Hotel, afterward at the Maison Riche, and finally took up his abode at Tortoni's tavern or lodging-house and restaurant. Part of his time he spent also in the southern portion of this state, which he found suited to his disposition, lauding highly the country around about Los Angeles in his letters from that section. In this city, in the year 1899, he made the acquaintance of proponent at a certain resort in which she was a resident; according to her recital their acquaintance began at that house where an accident occurred to him through his falling downstairs, cutting his eye and nose, she attended him and the friendship thus commenced continued until his death; they went to Honolulu together, he buying the tickets, and he introduced her on the steamer as Mrs. Kershow; they returned on the same steamer, the "Australia," in about six weeks and went to live at the Maison Riche restaurant.

The testimony of William Dresbach, ticket agent for the Oceanic Steamship Company, in a measure confirms proponent's statement as to the Honolulu trip. Dresbach pro-

duced a ticket which he said was sold by him on December 11, 1899, to the person signing on the side "M. H. Kershow." Dresbach did not know him personally, did not know his identity apart from the transaction; the writing "M. H. Kershow & wf." on the ticket meant M. H. Kershow and wife; the ticket produced was the first half of a round-trip ticket to Honolulu, purchased by that person. The signature of the purchaser was identified as that of Max H. Kershow.

Proponent lived with decedent at the Riche until March, 1900, when she went back to her former residence and he remained at the restaurant lodgings; she went east in April and stayed there until the latter part of the summer, when she returned and went again to the Riche, where he was still abiding; there she remained with him until November, when she went to Oregon and upon her return took up with him at Tortoni's, where she sojourned until the following February or March, when she went back to her old home and there stopped until she went to China in May, 1901, where she was when decedent died and where she was advised of his death, leaving a will in which she was a beneficiary and legatee. If proponent is to be believed, she knew nothing of the alleged will until the information came to her in China by cable about the 3d of July, and never saw the paper until she returned here in the latter part of August, 1901, when it was exhibited to her in an attorney's office.

Proponent separated from decedent several times, she said, because he would go on a drinking spell and when she could not correct him she would leave him, but they continued friendly; she scolded him for his lapses, but never chastised him except verbally; never laid hands on him save in the way of kindness; after she quit Tortoni's she still visited him nearly every day until she went to China; had dinner there at times with him; she was there every Saturday night and remained over Sunday; used to go up there after dinner on Saturday night; she saw Morgan Smith there frequently—he dined there at times; she visited decedent frequently at his rooms in April, 1901, and saw different persons in his apartments at various times, among others Morgan Smith, Carlton Kershow, Moses Getz and his two barkeepers, and other friendly visitors; Morgan Smith was there on the occasion

of the injury to his eye for about a week. In the opinion of proponent decedent was of sound mind, her judgment being based on his acts and conversation; he drank a good deal; about half the time intoxicated; sometimes sober two or three days at a time; he would sometimes drink Apollinaris in his whisky, but considering that too expensive he substituted plain water for dilution; he never drank absinthe while she was with him.

It was this woman whom decedent made his residuary legatee, describing her as his sincere and devoted friend, if Morgan Smith is to be credited. When Smith on the evening of the 5th of April, 1901, was requested by Kershow to draw the will, the latter said, "I am, as you know, in love with Miss Gettings. I do not see that I should leave anything to my family; they have not done the right thing by me; they have tried to prevent me doing several things I wanted to do, and, therefore, I want this to be a matter of the greatest secrecy"; this was the gist of what decedent said that evening, according to Smith. Meadows testified that at the time of the execution of the will the deceased read it aloud, he remarked that his brother's name was misspelled and Smith asked if he should write it over and he said "No," that they had wasted enough time on the matter. He said that he wanted to provide for his dear friend "Babe," which appears to have been a pet name for proponent. Meadows asked decedent if he was a lawyer; he smiled and said he had studied law; the witness made the inquiry because of the terms used in the will; after decedent signed he said he would dictate the attestation clause and Smith then took down from dictation what is in that clause; then Smith and Meadows subscribed as witnesses; Smith added the date in presence of Meadows: "April the sixth, nineteen hundred and one." Meadows said he stated the facts as they occurred at the time of the transaction of signing the will; everything took place just as he testified. If, then, Meadows testified truthfully, Max H. Kershow signed the paper propounded, knowing its contents, in the presence of the two subscribing witnesses to whom he declared it to be his last will and testament, requesting them to be the witnesses of his act, and they signed each in his presence and in the presence of each other, and

he was sane and sober when all this was done; but contestant says that Dr. Wagner, John Roland, and Alice Kennedy, all unimpeached, prove that those two persons, Smith and Meadows, were not there at Tortoni's or thereabouts at the time indicated, and that this paper exhales the effluvia and exhibits all the earmarks and indicia of fraud and fabrication. So far as Dr. Wagner's testimony is concerned, the witnesses Smith and Meadows may have been there without his knowledge, as at the particular times to which they testify his attendance was not necessary and his absence is probable; but not so with Alice and John, as they swear they were there all the time and could not have been mistaken as to the facts.

The burden is upon contestant.

It may be that there is a suspicious similarity and agreement between the testimonies of Smith and Meadows, all the more remarkable because neither was present at the trial when the other was on the stand, suggesting a concert of purpose to concoct a spurious document and swear it through the courts; it may be that the very means have been here employed in this instrument which have become the "properties" and adjuncts of a dramatic play intended to impose upon judge and jury the false emanation of a criminal brain; it may be that the coupling as coexecutor with proponent of the name of a member of the bar of high repute, with whom decedent had but a casual acquaintance, bearing an inherited appellation of honor and distinction, was done with a design to give credit and currency to a counterfeit; it may be that the bequests to relatives were in the bill of properties drawn by the stage director for the successful presentation of this drama of contemporaneous human interest—but the question is, Are these surmises and suspicions proved directly or circumstantially? Are they susceptible of proof?

If Smith and Meadows tell the truth, then decedent was a sober man at the time of the execution, though suffering from the effects of a debauch which ended on the 1st of April; but he was not in liquor on the 5th or 6th of April, when he dictated and executed the will. If their story be fact and not fiction throughout, he was at that time competent to make a will, because it is evident from its terms that he possessed that degree of testamentary capacity at the moment of making

the will which entitles his act to consideration. Dr. Wagner's opinion of what decedent's condition was when he saw him is inconsistent with the theory that Kershow was enjoying a lucid interval when Smith and Meadows were with him. It has been held that if a testator, though insane, made a natural and consistent distribution of his property, a lucid interval at the moment of making the will might be justly presumed. In the English case of Cartwright v. Cartwright, the judge deciding said that the strongest and best proof that can arise as to a lucid interval is that which arises from the act itself, and if it can be established that it is a rational act rationally done, the whole case is proved.

It is hardly to be contended that decedent was a lunatic; the most that is claimed is that his habits had so debilitated his mind as to destroy his testamentary capacity; but if by the suspension of those habits for a period he so far regained possession of his faculties as to admit of the presumption that his testament was made during the time of his calm and clear intermission, such testament should be held good; and, as an ancient author affirms, although it might not be proved that the testator had any clear and quiet intermissions at all, yet nevertheless if the testament be wisely and orderly framed, the same ought to be accepted for a lawful instrument. Thus it might happen, in accordance with this principle, that a man who was acknowledged to be incapable of managing his own affairs would be deemed competent to dispose of his property by will, if the document seemed a rational act rationally done.

Alice and John testified that decedent sometimes had visions. Dr. Wagner thought he was subject to hallucinations, but there is no evidence that he had any delusion that operated on the testamentary act. Unless the will be the very creature of a morbid delusion put into act and energy, it is a valid will. The mere fact of the possession of a delusion, as was said in the charge to the jury in the case of Boardman v. Woodman, in New Hampshire, may not be sufficient to render a person utterly incapable of making a valid will; a person of sufficient mental capacity, though under a delusion may make such a will; if the testament be in no way the offspring of such delusion, it is unaffected by it. It can scarcely be pretended

that Max Kershow was laboring under any delusion at the time of the execution of this instrument. Whatever fault may be found with his preference of proponent for residuary legatee, he gave reasons which seemed to him sufficient, and the court has neither right nor power to quarrel with the moral quality of his acts; the court may not say that he should have made a different disposition; it cannot make a will for him.

According to Kershow's conception of his obligations this will was natural and consistent; he remembered his relatives and gave their names, although through the error of the scribe his brother's name was misspelled; he gave something to his female servant and to his friend Smith, and the rest to the proponent. To these persons he was bound, in the language of the law, by ties of blood, affinity or friendship; he had an idea of the character and extent of his property, and he was capable of considering the persons to whom and the manner and proportions in which he wished his property to go; these are the constituents of testamentary capacity.

The evidence of Smith and Meadows is not overborne by that of the witnesses for contestant; the attempt to impeach the reputation of the latter was countered by testimony in his favor, but the weight to be given to either or both is not affected by that sort of evidence, one way or another, in view of the facts and circumstances corroborative of their statements already recited at length. Treating this case as if the onus lay where the law does not place it, it is made out in favor of proponent; at all events, the contestant has not proved by a preponderance of evidence the issues tendered by his opposition to the probate of this instrument, and judgment must be and is entered against him.

-----

While a Foreign Will may be subject to contest when application is made to have it proved and recorded in a jurisdiction where the testator left property, still it should be observed that a judgment in a probate proceeding is a judgment in rem—that is, it determines the status of the matter. Therefore, the judgment of a court admitting a will to probate fixes the status of the instrument as a will, and becomes at once conclusive upon the world of all the facts necessary to the establishment of a will, among which are, that at the time the will was executed the testator was of sound and disposing mind, and was not acting under duress, fraud or undue influence. It fol-

lows, for example, that a will executed in California by a testator there residing, and subsequently admitted to probate in that state, may not, when afterward admitted to ancillary probate in Montana, where the testator left real and personal property, be contested on the ground that the testator was not of sound mind, or acted under duress, fraud or undue influence, the Montana statutes providing that when such foreign will is admitted to probate in this state it shall ''have the same force and effect as a will first admitted to probate in this state'': 1 Ross on Probate Law and Practice, 291.

**When the Will of a Nonresident is Admitted to Probate** on original proceedings for the purpose of administering on his property within the state, the decree therein binds that property here and everywhere that our courts are accorded full faith and credit, but it is not binding as to the will itself in other jurisdictions where the deceased may have left property, nor is it binding on the courts of his domicile: Estate of Clark, 148 Cal. 108, 113 Am. St. Rep. 197, 82 Pac. 760, 1 L. R. A., N. S., 996.

**A Person is of Sound and Disposing Mind** who is in the possession of all the natural mental faculties of man, free from delusion, and capable of reasonably thinking, acting and determining for himself: Estate of Ingram, 1 Cof. Pro. Dec. 222; Estate of Scott, 1 Cof. Pro. Dec. 271.